UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                               )
UNITED STATES OF AMERICA,       )
                               )
        Plaintiff-Respondent,   )
                               )
            v.                  )   CRIMINAL NO. 1:03-CR-10166-PBS
                               )
BRUCE TURNER,                   )
                               )
        Defendant-Petitioner.   )
                               )
                               )
_____)

## MEMORANDUM AND ORDER
June 28, 2011

Saris, U.S.D.J.

### I. Introduction

Petitioner, Bruce Turner, brings this writ of habeas corpus pursuant to 28 U.S.C. § 2255 claiming that (1) he received ineffective assistance of counsel during his criminal trial, and (2) he does not qualify for enhanced sentencing under the Armed Career Criminal Act ("ACCA"). 28 U.S.C. § 2255(a). A non-evidentiary hearing was held on January 11, 2011. After review of the record, petitioner's request for relief is hereby **DENIED**.

### II. Background

On May 14, 2003, petitioner was indicted for unlawful possession of a firearm in violation of 18 U.S.C. § 922 (a)(1). (Doc. No. 15). Specifically, Petitioner was charged with possession of an Intratec 9mm Luger, Model Tech - DCA with an obliterated serial number and a Llama .32 caliber semiautomatic

1

pistol. (Id.)  At trial, the government presented evidence
seeking to establish that in December 2002, petitioner discharged
one of the firearms at issue inside the residence of Thomas Casey
and that in January 2003, petitioner delivered a bag containing
both of the firearms to the residence of Ronald Smith. (Trial Tr.
vol. 1, 62:20-63:11, 64:18-24; Gov't Brief at 1, Aug. 10, 2010,
Doc. No. 158.)  The government also presented evidence that John
Trimarchi, who was acting as an FBI informant, retrieved both
firearms from Smith's residence in January 2003 at the
instruction of the petitioner. (Trial Tr. vol. 1, 65:1-66:8.)  On
January 23, 2004, the jury returned a guilty verdict, and this
Court sentenced the petitioner to 235 months imprisonment under
the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(c). (Doc
No. 95.)

On appeal, petitioner argued (1) that the District Court
should have treated the Sentencing Guidelines as advisory and not
mandatory, and (2) that the District Court should not have
sentenced petitioner under the ACCA. (Doc No. 112.) On March 1,
2006, the Court of Appeals affirmed the conviction, but vacated
the sentence in light of Booker v. United States, 543 U.S. 220
(2005).  On July 17, 2006, this Court held a re-sentencing
hearing and Petitioner was re-sentenced to 211 months
imprisonment. (Doc No. 123.)  The same day, petitioner filed a
second appeal challenging the application of the ACCA at his

sentencing. (Doc No. 122.)  The government moved for summary

disposition, which was allowed. (Doc No. 127.)  Petitioner then

filed a writ for certiorari with the United States Supreme Court,

and the petition was denied on October 1, 2007. (Doc No. 07-181);

Turner v. U.S., 128 S. Ct. 322 (2007).

On September 29, 2008, petitioner filed a timely Motion to

Vacate, Set Aside, or Correct a Sentence pursuant to 28 U.S.C. §

2255 arguing that he had been provided with ineffective

assistance of counsel and that his sentence was contrary to law.

(Doc No. 129.)  On January 13, 2010, nearly sixteen months later,

petitioner filed a memorandum in support of the § 2255 petition.

(Doc No. 141.)  In his memorandum, petitioner elaborated on his

ineffective assistance claim and included two additional theories

to support that claim.  First, he argued that trial counsel "did

not impeach the government's witnesses effectively," (Pet. Brief

25) and, second, he argued that appellate and trial counsel

unreasonably failed to "object to jury instructions that

permitted an unconstitutionally non-unanimous verdict."  This

last argument was also asserted in an amendment to the initial

petition. (Id. at 29; Doc No. 146.)

### III.  Discussion

### A. Ineffective Assistance of Counsel

#### 1. Timeliness

The government argues that petitioner's ineffective

assistance of counsel claims asserted subsequent to his original

section 2255 motion are untimely. Under 28 U.S.C. § 2255(f),
Petitions must be filed within one year of the latest of either
one of the following: "(1) the date on which the judgment of
conviction becomes final; (2) the date on which the impediment to
making a motion created by governmental action in violation of
the Constitution or the laws of the United States is removed, if
the movant was prevented from making a motion by such
governmental action; (3) the date on which the right asserted was
initially recognized by the Supreme Court, if that right has been
newly recognized by the Supreme Court and made retroactively
applicable to cases on collateral review; or (4) the date on
which the facts supporting the claim or claims presented could
have been discovered through the exercise of due diligence." 28
U.S.C. § 2255(f).

Here, petitioner's conviction became final on October 1,
2007, when the United States Supreme Court denied his writ for
certiorari. See In Re Smith, 436 F.3d 9, 10 (1st Cir. 2006). He
filed his petition for post-conviction relief pursuant to 28
U.S.C. § 2255 on September 29, 2008, alleging ineffective
assistance of counsel at his criminal trial and erroneous
sentencing under the ACCA. On January 13, 2010, petitioner filed
a memorandum in support of his original petition and an amendment
to the petition, both of which included additional claims. (Doc
Nos. 141, 146.) Petitioner's initial filing was timely. The

4

question here is whether the new arguments and claims raised in the January 2010 filings are cognizable by this Court even though they were asserted more than a year after the conviction became final.

Amendments to habeas petitions are governed by Federal Rule of Civil Procedure 15. <u>United States v. Ciampi</u>, 419 F.3d 20, 23 (1st Cir. 2005). This rule permits "otherwise untimely pleading amendments to 'relate back' to the date of the timely-filed original pleading, provided the claim asserted in the amended plea 'arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading'." <u>Id.</u> at 23 (citing Fed. R. Civ. P. 15(c)(2)). "However, in the habeas corpus context, the Rule 15 'relation back' provision is to be strictly construed, in light of Congress' decision to expedite collateral attacks by placing stringent time restrictions on [them].'" <u>Id.</u> (citing <u>Mayle v. Felix</u>, 545 U.S. 644 (2005)). "Accordingly, amended habeas corpus claims generally must arise from the 'same core facts,' and not depend upon events which are separate both in time and type from the events upon which the original claims depended." <u>Id.</u> at 24. "A Petitioner does not satisfy the relation back standard merely by raising some type of ineffective assistance in the original petition, and then amending the petition to assert another ineffective assistance claim based on an entirely distinct type of attorney misfeasance." <u>Id.</u> at 22.

The original Section 2255 petition alleges that petitioner's trial counsel provided ineffective assistance in failing to introduce recorded conversations inconsistent with the government's theory; failing to seek discovery of evidence related to the relationship between a government witness and the FBI and other evidence submitted to the U.S. Attorney that was inconsistent with the government's theory; failing to adequately investigate the government's witnesses; failing to adequately investigate and call other witnesses who would have been helpful to petitioner's case; failing to follow up on alleged "threats to and intimidation of a defense witness" by the government; and engaging in a line of questioning harmful to petitioner's case.

The claim relating to trial and appellate counsel's failure to advocate for a more explicit instruction on unanimity is clearly different both in "time and type from the events upon which the original claims depended." See U.S. v. Ciampi, 419 F.3d at 24. The timely filed claims relate to counsel's preparation for and performance at trial, whereas the claim regarding jury instructions concerns events after the close of evidence. Moreover, as opposed to the timely claims, which all concern the presentation of factual issues, this claim relates to the Court's instructions of law. The jury instruction claim, therefore, does not relate back to the timely filed petition.

As the government recognizes, however, the newly asserted claim related to the petitioner's failure to "effectively"

6

impeach government witnesses is a "closer call." The memorandum filed in January 2010 makes a general allegation that trial counsel failed to adequately cross examine government witnesses, and then focuses in particular on trial counsel's failure to impeach Ronald Smith, who prior to trial had provided inconsistent statements about when and how the guns were delivered to his house, and John Trimarchi, who had made statements to the FBI indicating that the guns were owned by one of Turner's co-defendants in a different case, Bruce Ziskind ("Ziskind").

Neither the broad claim that trial counsel failed to effectively impeach government witnesses nor the more specific allegation regarding Smith's inconsistent statements relate back to the timely filed petition. The only reference the petition makes to cross examination concerns the elicitation of prejudicial testimony regarding the petitioner's illegal drug activities during trial counsel's cross examination of Smith. Although this claim arises from facts occurring at the same time as those giving rise to the newly filed claim, namely during the cross examination of a government witness, the specific allegation in the timely claim is fundamentally different in type from the claim that trial counsel's cross examinations of government witnesses was, in general, not effective.

Petitioner's ineffective assistance of counsel claim concerning trial counsel's failure to cross-examine Trimarchi regarding his prior inconsistent statements is more difficult. The petition makes numerous references to evidence that the guns were owned by and at times possessed by Bruce Ziskind.(<u>See</u> Pet. at 19 (Counsel failed to introduce recorded conversations that would have suggested that Bruce Ziskind had given the guns to Ronald Smith and that the guns in question belonged to John Trimarchi).) And, more specifically, the original petition alleges that counsel failed to investigate evidence provided to the U.S. Attorney's office that the guns were Ziskind's and had been passed on to Smith while Ziskind dealt with legal problems in another matter. (Pet. at 20.) The evidence proffered in support of these positions included Trimarchi's prior statements to the FBI, the same statements which petitioner now asserts should have been used by trial counsel to impeach Trimarchi on cross examination. The newly asserted claims, thus, share a factual predicate with the timely filed claims. Though the timely filed claims concern pretrial investigation and the later asserted claims address counsel's performance at trial, the natural corollary of the failure to investigate potentially exculpatory evidence is the failure to bring out this evidence at trial. For this reason, the later filed claims regarding

cross examination of Trimarchi relate back to the timely petition.

### 2. Merits of the Ineffective Assistance of Counsel Claim

#### a. Standard

The government argues that Petitioner's trial counsel "put in a creditable, if flawed, performance" at trial, and that even if Petitioner can demonstrate that his trial counsel's conduct was unreasonable, he cannot establish that it was prejudicial.(Gov't. Br. at 2.)

"The Sixth Amendment guarantees criminal defendants the right to effective assistance of counsel." Lema v. United States, 987 F.2d 48, 51 (1993) (citing Strickland v. Washington, 466 U.S. 668 (1984)).  However, "the constitution does not guarantee a letter-perfect defense or successful defense; rather, the performance standard is that of reasonably effective assistance under the circumstances then obtaining."  Id. (citing Unites States v. Natanel, 938 F.2d 302 (1st Cir. 1991)).  "A petitioner bears a very heavy burden on an ineffective assistance claim.  The habeas court must 'evaluate the [challenged] conduct from counsel's perspective at the time.'" Id. (citing Strickland, 466 U.S. at 689).

To succeed on an ineffective assistance of counsel claim, the petitioner must establish that (1) "counsel's representation fell below an objective standard of reasonableness," and (2)

"there exists a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." United States v. De La Cruz, 414 F.3d 121, 140 (1st Cir. 2008) (citing Strickland, 466 U.S. 668, 688, 694).

In reviewing trial counsel's conduct, the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight." Id. In assessing the probability of a different outcome, the court should keep in mind that "a reasonable probability is one that sufficiently undermines the confidence in the outcome." Soberal v. United States, 244 F.3d 273, 278 (1st Cir. 2001) (citing Strickland, 499 U.S. at 694). "It is not enough to show that the errors had 'some conceivable effect on the outcome.'" Id.

Furthermore, "there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." Strickland 499 U.S. at 694. See Sorberal, 244 F.3d at 278 ("Addressing the prejudice prong prior to evaluating counsel's conduct is a permissible approach and even endorsed where more efficient.").

b. <u>Evidence Presented at Trial</u>

As background, it is worth laying out the considerable evidence the government presented in making out its case that the petitioner, at various points between December 2002 and January 24, 2004, possessed a Tech 9 and a Llama .32 caliber firearm.

The government's first witness was Smith, who testified that in early January 2003, the petitioner left a brown bag at his house, which Smith later discovered contained a firearm. (Trial Tr. vol 1, 79-81.)  Smith claimed he had a conversation with Turner about picking up the bag on January 24, 2003. (<u>Id.</u> at 83).  That same day Trimarchi came to Smith's house to pick up the bag. (<u>Id.</u> at 92-93.)

The next witness was Thomas Casey ("Casey").  Casey testified that in December 2002, Turner visited him with a .32 caliber Llama firearm. (Trial Tr. vol. 2, 43-44.)  After showing the gun to Casey, Turner took it upstairs.  When trying to fix a clip that had broken off the gun, Turner allegedly fired it through the floor and into the ceiling of Casey's dining room. (<u>Id.</u> at 44-47.)  A ballistician later determined that the bullet recovered from Casey's house belonged to the .32 caliber weapon specified in the indictment. (<u>Id.</u> at 124.)  Casey also testified that the other weapon, the Tech 9, had been stored at his house through 2002, but in early 2003, he discovered it was missing. (<u>Id.</u> at 51.)

John Trimarchi also testified at trial. Trimarchi
confirmed Casey's testimony about the firing of the .32 caliber
firearm in Casey's residence in December 2002. (Id. at 135-139.)
He also explained that in late 2002, he and Trimarchi were at
Casey's house for a party, when he saw a Tech 9 firearm stored
in Casey's closet and brought it to the petitioner's attention.
He then testified that in January 2003, when Trimarchi was
cooperating with the FBI and wearing a recording device, the
petitioner asked him to retrieve both the guns at issue from
Smith's house. (Id. at 147-50.)

Even more supportive of the government's case were tape
recordings collected by Trimarchi while he was cooperating with
the FBI. The recordings submitted at trial included the
following:

1. A recording of the petitioner speaking with Smith about
the guns stored at his house. On the recording the petitioner
states: "This is Bruce. What are you up to? Yeah. Yeah, alright.
Yeah. Still have that without saying it? . . . I'm gonna come by
in a little while and grab it." (Id. at 91-92.)

2. A recording of a later conversation between the
petitioner, Trimarchi, and the petitioner's friend Brendan
Trainor, regarding the incident at Casey's house in which
Trimarchi told the petitioner that he had "bragging rights for

shooting guns with Tom 'the Rifleman' Casey" and Turner responded, "I shot him in the house." (Id. 3:14-15.)

3. A recording of the petitioner speaking with Trimarchi about the firing of the .32 caliber gun at Casey's house. On the recording, in response to Trimarchi saying "I can't believe. You could've shot someone in the head. You got a problem with my rug, right? That's what it was," the petitioner responds, "[g]ood thing no one was downstairs."

4. A recording from January 30, 2003 in which the petitioner makes reference to the prior possession of a .32 caliber firearm and his desire to have it back. The critical portions of the recording are the following:

> Petitioner: . ... I want that handgun. I need that handgun.
>
> Trimarchi: You don't need it like that.
>
> Turner: Yeah, I do.
>
> Trimarchi: I'm tellin' ya, you don't want to bring that in there, unless you have to. You know.
>
> Turner: If I don't get my shit by tomorrow after what I did for it. I'll fuckin' leave him at his house. I'm not kidding. I'm serious. I'm very serious. He's on trial with the feds, they won't even look. No, I want it for tomorrow. I won't bring it in my house. I want it for tomorrow to go do what I'm doing. I'll throw the fucking thing away. That's why I had the .32 at the time. Can you have it, the .32 by tomorrow?

In a conversation from later that day, the petitioner confirmed his prior possession of the gun and his desire to reacquire the .32 caliber:

Petitioner: I want my bag. . . . I want the little
one out of the bag. . . I want that little one.

. . .

Petitioner: I know you got that bag. Can you just get
the little one?

. . .

Petitioner: I have more. I just want a little one
[INAUDIBLE]

According to Trimarchi, the petitioner's references to the
"little one" referred to the .32 caliber, and the "bag" referred
to the bag stored at Smith's house.

c. <u>Impact of Trial Counsel's Errors</u>

Trial counsel's performance was far from the paragon of
advocacy. But the petitioner cannot demonstrate a reasonable
probability that even if he had had the benefit of an able
defense, the outcome in his case would have been any different.
See <u>Gonzalez-Soberal v. United States</u>, 244 F.3d 273, 278 (1st
Cir. 2001). In reaching this determination, the Court weighs
the strength of the case against the petitioner with the
evidence and arguments that he asserts should have been made, or
in some instances, should not have been made to the jury.
See <u>id.</u> at 278. Because the evidentiary impact of trial
counsel's errors did not affect the outcome of the petitioner's
case, he cannot meet the high bar for proving ineffective
assistance of counsel.

Petitioner's timely filed claim alleges that trial counsel
failed to introduce the following evidence or arguments to the
jury:

14

i) Taped recorded conversations inconsistent with the government's theory:

The government recorded hours of conversations involving the petitioner, the government informant, Trimarchi, and others. The recordings presented to the jury paint a clear picture of the petitioner firing a weapon in Casey's house and then seeking to retrieve guns deposited at Smith's house. However, the jury did not hear several taped conversations that indicate that Bruce Ziskind may have been the owner of at least one of the weapons.

On January 24, Trimarchi recorded the following conversations with the petitioner:

Excerpt 1

Trimarchi: We should pick up that thing.

Petitioner: Yeah but once you pick up that thing we will have to take the rest of the bag here and there is another gun in it.

Trimarchi: We can leave it at my house.

Excerpt 2

Trimarchi: Is Bruce [Ziskind] going to get them back?

Petitioner: He can't get them.

Excerpt 3

Petitioner: I am going to leave it where it is for now, don't want nothing to do with it because of my girl.

Trimarchi: Yeah, I hear you.

Petitioner: . . .if I had an FID card, I could have it at

my house, believe it or not.

Excerpt 4

Petitioner: Do you have that bag at your house?
(Sometime later)

Petitioner: I want that piece.

Trimarchi: If we don't do fucking something tonight.

Petitioner: Can I have that piece?

Trimarchi: I do not have it.

Petitioner: You said you had it in the trunk. Can I just hold it?

Trimarchi: No, just leave it alone.  I'll get it later.

(Pet. Br. at 12-15.)

Four days after Trimarchi picked up the guns from Smith's house and gave them to the FBI, Trimarchi returned to the petitioner's house.  They had the following conversation:

Trimarchi: What happens if kid don't fuckin' come through tonight? What's going on? What's up?. . . We can't leave him out of our sight 'til he shows us. . . maybe torture and kickin'. . .pull off his fingernails.

Petitioner: Where's the bag?

Trimarchi: What bag?

Petitioner: The bag with all the stuff in it.

Trimarchi: At Randy's. We ain't use that if we have to it's not worth it.

Petitioner: Yeah, well, his things in it too.  What if he wants his thing. His things in it too. He has stuff in that bag.

Trimarchi: When we see it and we know what's going on, he

16

gets his shit back. Until then, I'm sorry.

(Pet. Memo at 14.)

Petitioner also alleges that some recorded conversations indicate that the guns in question may have belonged to Trimarchi.  On January 30, 2003, Trimarchi and the petitioner had a conversation at a bar and then left together to meet with Ziskind.  The following conversation was recorded:

Petitioner: Do you have that bag at your house?

(Trimarchi and petitioner leave bar.)

Petitioner: I want that piece.

Trimarchi: If we don't do fucking something tonight.

Petitioner: Can I have that piece?

Trimarchi: I do not have it.

Petitioner: You said you had it in the trunk. Can I just hold it?

Trimarchi: No, just leave it alone.  I'll get a couple later.

On January 31, 2003, nearly a week after Trimarchi picked up the guns at Smith's house and provided them to the FBI, he had a conversation with two other individuals regarding "the guns."  The following excerpt was recorded:

Trimarchi: I got all their guns. . . I put the guns in my truck and I put them away.  They're gone.  Now no one's got guns to play with.

(Pet. Mem. at 16.) That day Trimarchi also spoke to Ziskind about the guns.  The following conversation was recorded:

Ziskind: I want to buy that thing from you.

Trimarchi: Yeah?

Ziskind: Yeah.

Trimarchi: Alright.

Ziskind: So ah, I had it all cleaned up it should be working fine. It's ready to go. Whatever you do don't touch it though.

Trimarchi: I don't fuckin' touch it. It's in a box.

Ziskind: It's in a bag right? You got that bag for it.

Trimarchi: He put it in a box. Ronnie put it in a box. It's in a bag but. . .

Ziskind: Oh, it's in the bag.

Trimarchi: Yeah, he put a box on it too.

Ziskind: He didn't touch it, did he?

Trimarchi: I hope he didn't.

Ziskind: 'Cause if he did, he'd be a fool.

Trimarchi: No. He wouldn't touch. . . he handed it to me with a towel, like this. . . in the box.

Ziskind: 'Cause I put it in a bag. That's the best way to do it. I keep it in a trash bag, it catches all the shell casings, the trash bag.
                            . . .
Ziskind: Can you get a hold of that? . . . Tonight would be a  beautiful night,. . . it's rainy.


Following Trimarchi's conversation with Ziskind, the

petitioner approached Ziskind to ask him about what Ziskind

wanted:

Petitioner: What were you talking about?

Trimarchi: He [Ziskind] was talking to me about the

18

case. He wants to grab that thing from me.

Petitioner: . . . Don't do that. If you want, I'll buy
it.

Trimarchi: Ain't no one buying it.

Petitioner: He wants the other piece; I know what he's
up to.

        . . .

Petitioner: What were you and [INAUDIBLE] talking
about?

Trimarchi: We were just talking about his case and then he
said 'that thing you got, I fixed it all up now. It now
works good. I'd like to buy it from you.' I said I don't
know, I've got that put away.

(Pet. Br. at 18.)

  Even if trial counsel erred in not introducing these tapes,
petitioner cannot make a persuasive argument that the jury would
have come to a different conclusion.  When this evidence is
viewed in the light most favorable to the petitioner, a jury
might infer from the tapes that Ziskind owned at least one of
the guns.  Trimarchi's statement from the January 24 tape "Is
Bruce going to get them back?" supports this theory.  But other
recordings, even if further support for the notion that Ziskind
owned one of the guns, present a fuller picture that also
implicates the petitioner.  For example, in one of the January
24 conversations, the petitioner noted that "once you pick up
that thing we will have to take the rest of the bag here and
there is another gun in it."  In a later conversation,
subsequent to Trimarchi surrendering both firearms to the FBI,

the petitioner said, in regard to the bag with the firearms, "Yeah, well, his things in it too.  What if he wants his thing. His things in it too.  He has stuff in that bag."  The latter statement in particular implies that Ziskind had ownership over at least one of the weapons.  However, the evidence is also a two-edged sword, as a jury might interpret these statements as acknowledgments that the other weapon belonged to the petitioner.

With regard to the recordings suggesting that Trimarchi owned or possessed the firearms – for example Trimarchi's January 31 statement to two other individuals, "I got all their guns. . . I put the guns in my truck and I put them away" – these statements likely would also not have affected the jury's determination.  First, the government never contended that the petitioner had actual possession of the firearms after Trimarchi retrieved them from Smith's house, when the weapons were surrendered over to the FBI.  Moreover, Trimarchi's reference to "<u>their</u> guns" and his stated desire to keep the guns away from the petitioner support the government's case that the petitioner had possession of at least one of the firearms before they were dropped off at Smith's house.

On their own, therefore, the recordings that trial counsel failed to introduce do not undermine the government's position that the petitioner possessed the weapons at issue.  When

compared to the compelling evidence that the government submitted, trial counsel's alleged errors are even less likely to have caused prejudice. The government played recordings of the petitioner asking Smith whether he still "ha[d] that without saying it," presumably referring to the weapons, and a conversation between Trimarchi and the petitioner in which the petitioner responds to Trimarchi's statements regarding the petitioner shooting a firearm into the floor at Casey's house "[g]ood thing no one was downstairs." A reasonable jury would consider this latter statement to constitute an admission that the petitioner possessed the .32 caliber in December 2002. The jury was instructed, without any objection from the petitioner, that it needed only find that the petitioner possessed one of the firearms during the period in question. (Trial Tr. vol 4, 50:13-19.) Therefore, the omitted recordings do not undermine the finding of guilt, which was well-supported by the recordings that were in evidence.

ii. <u>Failure to Investigate and Call Witnesses</u>

Petitioner also claims ineffective assistance of counsel on the grounds that trial counsel failed to investigate and call certain witnesses. Petitioner first claims that trial counsel "failed to adequately investigate the government's witnesses prior to trial and, in the instances where he had information to use, failed to use it effectively." While petitioner concedes that trial counsel did interview the government's key witness,

Trimarchi, he contends that trial counsel did not investigate the "ways to impeach each government witness" where their credibility was "crucial to the government's case."

With respect to petitioner's claim that trial counsel's failure to introduce evidence regarding Trimarchi's extensive relationship with the FBI constituted ineffective assistance, there is no indication that the addition of further evidence relating to this issue would have altered the weight the jury gave Trimarchi's testimony. During his cross-examination of Trimarchi, trial counsel focused on benefits Trimarchi received for cooperating. (<u>See</u> Trial Tr. vol. 3, 26-32 (regarding financial payments and assistance to relocate); <u>id.</u> at 32 (regarding calls to an FBI agent about whether he could "save [Trimarchi's] license"); <u>id.</u> at 39 (regarding not being prosecuted for illegally buying and using cocaine).). The jury was, therefore, already aware of Trimarchi's incentive to lie. Moreover, even if Trimarchi's credibility were further eroded by additional evidence concerning his relationship with the FBI, his testimony was significantly corroborated by tape recordings supporting Trimarchi's assertions that the petitioner had had possession of the .32 caliber handgun. (<u>See</u> Trial Tr. vol. 3, 158.) Therefore, the jury would have likely believed Trimarchi's testimony even if provided with a fuller picture of his incentives to testify.

Petitioner then asserts that trial counsel failed to call three witnesses who would have been helpful to Petitioner's defense, Cynthia Turner-Awbrey, Petitioner's mother, Christina Anagnos and Brenden Trainor. According to the petitioner, his mother would have testified that Trimarchi informed her that another individual, not the petitioner, had fired the gun at Casey's house. He alleges that Trainor would have testified about the context of the January 31, 2009 conversation offered by the government as evidence that the petitioner had fired the gun at Casey's house. Apparently, Trainor would confirm that when he and the petitioner were recorded talking about the shooting incident, they both were speaking about Casey as the person who actually fired the weapon. Petitioner does not state what Anagnos would have testified.

These failures raise a closer question of prejudice, but they also would not have made a difference at trial. The government provided clear and undisputable evidence of the petitioner's role in at least the shooting at Casey's apartment. The most reasonable inference that could be drawn from the petitioner's statement "Good thing no one was downstairs" in response to Trimarchi's question "You got a problem with my rug?" was that the petitioner was the one who fired the Llama .32. Trainor was not a percipient witness to the firing of the gun, and it is unlikely that the jury would have found his

testimony convincing enough to overcome the clear import of the introduced recordings.  Moreover, as she is the petitioner's mother, Ms. Turner-Awbrey's testimony would have been challenged by apparent credibility issues.

iii. <u>Failure to Investigate Government Misconduct</u>:

Petitioner also contends that he received ineffective assistance from his trial counsel because trial counsel failed to investigate an allegation of prosecutorial misconduct after "it came to light that there were allegations of threats and intimidation of defense witness, Brenden Trainer [sic]."  (Pet. Brief 24.)  In support of this claim, petitioner offers the report of a private investigator to whom Trainor allegedly made various statements about his encounter with FBI officials. (Wilkins Aff., Ex. 15.) For all of the reasons discussed above, however, there is no indication that this failure was prejudicial.  Even if Trainor had been called as a witness, his testimony would have been unlikely to make a difference.  It is difficult to see how Trainor could convince a jury that the recorded conversation for which he was present refers to someone other than the petitioner firing the weapon, especially considering the fact that Trainor was not an eye witness to the shooting.

iv. Eliciting Prejudicial Testimony

Petitioner also argues that he received ineffective assistance at trial because, during the cross examination of Smith, trial counsel "elicited irrelevant and highly prejudicial evidence" about Petitioner and repeatedly engaged in a line of questions harmful to Petitioner's case.

On direct, Smith offered testimony concerning his relationship with petitioner and his knowledge of Petitioner's possession of firearms. On cross examination, trial counsel engaged in the following exchange with Smith:

Q: Okay. Now you said you saw the defendant, what, occasionally back in January, December of 2002, January of 2003?

A: From time to time.

Q: From time to time?

A: Yeah.

Q: Once a week, once a month, once a night? What?

A: We did not have a set schedule.

Q: He came over your house, did some drugs. He brought you drugs?

A: Yes.

Q: You gave him drugs? How did it work? Did you give him drugs?

A: No. I bought them off him.

Q: You bought them off him?

A: Yeah.

Q: You did cocaine together?

A: Yes, I did.

Q: So did you do an eight ball? How much would you do?

A: I don't know. I don't have a scale at my house.

Q: You don't have a scale?

A: No.

Q: How do you know how much drugs you were doing? Just keep doing it till you pass out? How much did you do?

A: I'm not laughing at you. You don't do cocaine. You don't actually pass out when you use a lot of cocaine. . . We did enough where we would get crazy.

Q: Okay. Crazy. So you did it to the point where you were crazy?

A: Not crazy. We would get to the point where you just got too high, yeah.

(Trial Tr. vol. 1, 104:16-105:24.)

Once the testimony occurred, the Court took action to preclude any such questioning during the remainder of cross examination and on redirect. (Trial Tr. vol. 1, 117:10 - 218:20.) Even though trial counsel's eliciting the information from Smith concerning petitioner's drug dealing may well have fallen beneath the threshold of professional reasonableness, there is little possibility that the outcome of the trial would have been different without this testimony, particularly in light of the damning tape recordings.

v. <u>Failure to Cross Adequately Cross Examine Trimarchi</u>

The petitioner points to a number of statements Trimarchi made to the FBI during the investigation that were not brought out at trial. These include Trimarchi's statement that he "was paid between $100 and $125 to hold the black duffle bag containing the weapons for TURNER and ZISKIND." (Wilkins Aff., Ex. 17 at 21.) Trimarchi also apparently told the FBI that "Ziskind had given some firearms to corrections offer names [sic] Smith to hold for him because Ziskind 'had some legal problems.'" (Wilkins Aff., Ex. 1 at 2.) Most problematic, perhaps, are Trimarchi's statements from the following month when he told the FBI that Smith was in possession of "two" of Ziskind's firearms and that Ziskind had given several handguns to the petitioner. (Wilkins Aff., Ex. 3.)

In their best light, these statements could be interpreted to suggest that one or both of the firearms in Smith's possession were owned by Ziskind. However, some of the statements, including Trimarchi's statement that he had held the duffle bag containing the weapons for Ziskind <u>and</u> the petitioner, and that Ziskind had given several handguns to the petitioner, support the government's case.

Petitioner also argues that counsel should have more forcefully cross-examined Trimarchi to undermine his credibility. For example, the statements regarding Ziskind's

ownership reflect inconsistent accounts of who owned and possessed the guns, which could have been used to impeach Trimarchi at trial. Recordings of conversations between Trimarchi and the FBI suggest that the FBI was interested in Trimarchi's role in possessing these firearms and others, and provide another reason why Trimarchi might have wanted to implicate the petitioner. Nonetheless, as discussed above, the jury did hear evidence about Trimarchi's incentives to lie, and it is unlikely that his credibility would have been any further eroded through these means. Furthermore, even if the jury had discredited Trimarchi's testimony, there was sufficient corroborating evidence to find the petitioner guilty, most notably Smith's testimony and the recordings, which fairly clearly indicate that the petitioner had possession of at least one of the firearms.

### B. Resentencing in Light of Vacated Conviction

As an alternative to his ineffective assistance claim, petitioner seeks vacatur of his sentence or resentencing because he does not qualify for enhanced sentencing under the ACCA. Specifically, petitioner contends that two of the four predicate offenses used to enhance his sentence under the ACCA are invalid.

The Court enhanced the petitioner's sentence on the basis of the following four predicate state convictions:

1. Assault and battery with a dangerous weapon in Salem District Court;

2. Assault and battery with a dangerous weapon in Middlesex Superior Court;

3. Assault and battery in Malden District Court; and

4. Possession of a class B substance with intent to distribute in Malden District Court.

The petitioner argues that two of these predicate convictions – his Malden District Court conviction for possession a class B substance with intent to distribute and his Salem District Court conviction for assault and battery with a dangerous weapon – no longer result in an enhancement under the ACCA. If his argument is credited, his total number of predicate convictions would be reduced to two, and he would no longer qualify as an Armed Career Criminal. See 18 U.S.C. § 924(e)(1).

The Malden court drug conviction is no longer eligible under the ACCA because in October 2008, this conviction was vacated by the Malden court, which noted the petitioner's contention that he thought he had pled only to possession and not intent to distribute. (See Wilkins Aff., Ex. 18.) The government argues, however, that the petitioner's effort to remove this conviction from ACCA consideration is time-barred because he did not attack the state court conviction with due diligence. In Johnson v. United States, 544 U.S. 295, 298

29

(2005), the Supreme Court considered whether a prisoner's § 2255 petition for re-sentencing in light of the vacation of a state court conviction that had served as a predicate for a career offender enhancement, see USSG § 4B1.1, was timely even though it was filed after the one year statute of limitations under AEDPA had expired. The Court held that an order vacating a prior state court conviction could serve as the starting point for the running of the one-year statute of limitations as long as that order was pursued with due diligence. See id. at 308.

Here, the government argues that petitioner did not diligently pursue the order vacating that Malden drug conviction. This argument stretches Johnson too far and would impose unfair requirements on prisoners sentenced under recidivism enhancements. The holding in Johnson was predicated, in part, on the "United States['] . . . interest in the finality of sentences imposed by its own courts," an interest protected by the one-year statute of limitations. After the one year statute of limitations has passed, § 2255 petitioners cannot lackadaisically challenge their state court convictions in hopes that one of the challenges will stick and that they will be able, some day, to return to federal court for a collateral attack on their recidivism-based sentencing enhancement. Within the one year statute of limitations, however, petitioners are not precluded from reexamining state convictions that have been

on the books, unchallenged, for a number of years. The Court

finds the government's argument unpersuasive and does not

consider the Malden drug conviction a predicate offense under

the ACCA.

This reduces the number of predicate convictions to three.

Petitioner must still successfully challenge at least one more

predicate conviction in order to undermine his enhanced

sentence. He also challenges his Salem District Court

conviction, alleging that the state court in that proceeding

unconstitutionally deprived him of his right to counsel. See

Gideon v. Wainright, 372 U.S. 335 (1963). In Daniels v. United

States, 532 U.S. 374 (2001), the Supreme Court held that

defendants filing § 2255 petitions may not directly challenge

state court convictions that serve as predicate offenses for

federal sentencing enhancements unless the defendant challenges

the state court conviction on the basis of a Gideon violation

and has not otherwise waived this argument. Id. at 382. Because

petitioner objected to the use of his Salem District Court

conviction on the basis of a Gideon violation at both his

sentencing and re-sentencing, this argument is neither waived

nor time-barred and is appropriately considered here.

The following facts regarding the Salem Court conviction

can be gleaned from the record:

According to an affidavit submitted by the Petitioner in

his state challenge to the Salem conviction (Wilkins Aff., Ex. 19,) in May 1989, the petitioner was arrested by the Salem Police Department and charged with 1) Assault and Battery with a Dangerous Weapon, and 2) Malicious Destruction of Property over $250,000. (Id. ¶ 2.) He was appointed counsel. (Id. ¶ 3.) Almost a year later, he appeared in court without his counsel where he alleges that the court offered to resolve the matter without a trial as long as he agreed to waive his right to a jury trial. (Id. ¶ 4.) Allegedly believing that if he did not agree to the Court's proposed resolution, he would be either held without bail or on a high bail, the petitioner agreed to the court's proposed resolution without counsel present. (Id. ¶ 5.) The petitioner now states he believes that he had legitimate defenses to his charges, which is why he had not resolved the matter at prior court appearances when his counsel was present. (Id. ¶ 7.) Also in the record is a copy of the petitioner's May 1989 state court "Waiver of a Right to Jury Trial." (Wilkins Aff., Ex. 20.) The waiver reads: "I, the above named defendant, have been given notice of my right to have a jury trial. I understand this notice. I hereby waive my right to a jury trial on the complaint(s) specified above." (Id.) Above the waiver are two check boxes, one reading "Counsel Waived" and the other reading "Represented by Counsel." On petitioner's form, the box for "Counsel Waived" is checked.

(Id.)

The absence of defense counsel at petitioner's plea in the Salem District Court case implicates the petitioner's constitutional rights under Gideon. A defendant's waiver of counsel and of the right to a jury trial must be knowing and intelligent, see Boykin v. Alabama, 395 U.S. 238, 242 (1969), and with regard to waiver of the right to counsel in particular, the Supreme Court has explained that the defendant "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" Faretta v. California, 422 U.S. 806, 835 (1975).

Despite these concerns, the Court does not believe it is necessary to further probe the facts surrounding the plea.  The posture of this case guides the Court's analysis.  As the First Circuit has explained in an analogous situation, once the government has carried the "modest" burden of establishing the existence of a predicate conviction for the purpose of federal sentencing enhancement, the conviction is presumed valid, and it becomes the "defendant's obligation to produce some evidence of unconstitutionality before a federal court may disregard the conviction. . . ." See United States v. Cordero, 42 F.3d 697, 701 (1st Cir. 1994)(addressing the defendant's burden when challenging the constitutionality of a predicate conviction at

the sentencing hearing under the Supreme Court's rule in <u>Custis</u> <u>v. United States</u>, 511 U.S. 485 (1994))(citations omitted). There is no question that the petitioner has asserted <u>some</u> evidence of unconstitutionality. His affidavit states that his decision to waive counsel and a jury trial were not informed. However, the "Counsel Waived" box on the Waiver of Jury Trial form is clearly checked, and the only evidence of any constitutional violation is the petitioner's affidavit, submitted years after the fact. <u>Cf.</u> <u>Commonwealth v. Lopez</u>, 426 Mass. 657, 690 N.E.2d 809, 814-15 (Mass. 1998)(defendant's affidavits stating that he had no recollection of plea proceedings did not overcome the presumption of regularity, which allowed the court to infer that recorded convictions were valid). This affidavit is suspect for a number of reasons. First, the waiver of the right to a jury trial supports the reasonable inference that petitioner waived his right to counsel too in order to gain the benefit of the judge's proposal. Second, it is highly unlikely petitioner remembers the proceedings from 1989. And, finally, petitioner has a substantial motive to lie, and there is no corroboration for his claims.

The record on this matter is sparse. As the Supreme Court noted in <u>Daniels</u>, one of the reasons why defendants cannot generally raise challenges to predicate state court convictions

in § 2255 petitions is that "a district court evaluating [such a petition] is. . .unlikely. . .to have the documents necessary to evaluate claims arising from long-past proceedings in a different jurisdiction." Daniels, 532 U.S. at 378. Gideon challenges do not fall outside the Daniels rule because they are any easier to evaluate years after the fact than other constitutional claims, but rather because the "failure to appoint counsel for an indigent defendant [is] a unique constitutional defect." Id. at 496. Though this Gideon claim is properly cognizable here, there is no credible evidence of a constitutional wrong.

This does not mean that petitioner is without any recourse. The state courts remain open to challenges to state criminal proceedings that served as predicates to federal sentencing enhancements. In February 2007, the State District Court ruled that "insufficient credible evidence has been introduced by the defendant which would permit the Court to allow the defendant's motion to withdraw his plea. .. or for a new trial in this matter." (See Pet. Mem., Ex. 5.) Currently, the Massachusetts Appeals Court is considering the matter. If the Commonwealth's courts deem the petitioner's conviction unconstitutional, and invalidate his criminal conviction, he is, of course, free to return to this Court to seek re-sentencing.

<u>ORDER</u>

The petitioner's 28 U.S.C. § 2255 petition is **<u>DENIED</u>**.

<u> /s/ PATTI B. SARIS          </u>
Patti B. Saris
United States District Judge